UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RAHSAAN FREEMAN, | CASE NO. 2:10-cv-01544-RSM |
| Plaintiff, | |
| v. | ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF DEFENDANT |
| U.S. BANK N.A., d/b/a U.S. BANK, | |
| Defendant. | |

## I. INTRODUCTION

This case is before the Court for judgment on Plaintiff Rahsaan Freeman's claim for promissory estoppel. He alleges that Defendant U.S. Bank National Association ("U.S. Bank" or the "Bank") made statements to him during the hiring process in 2010 that amounted to a legally enforceable promise. A bench trial was held to adjudicate the claim. For the reasons stated in the following Findings of Fact and Conclusions of Law, the Court enters Judgment in favor of U.S. Bank.

## II. BACKGROUND AND PROCEDURAL HISTORY

This case concerns U.S. Bank's decision to terminate Mr. Freeman several weeks after offering him employment in 2010. Freeman's Amended Complaint asserted claims against U.S. Bank for promissory estoppel and negligent misrepresentation. The Amended Complaint sought relief on the basis that during the hiring process, U.S. Bank promised Mr. Freeman that the details surrounding a past termination with the Bank would not affect Mr. Freeman's future employment. The Court granted summary judgment in favor of U.S. Bank on both claims. Dkt. # 36. Mr. Freeman appealed, and the Ninth Circuit Court of Appeals affirmed in part, reversed in part, and remanded the case for further proceedings. Dkt. # 45. Although it affirmed the Court's ruling on the negligent misrepresentation claim, the Ninth Circuit held that the Court erred in granting summary judgment on Mr. Freeman's promissory estoppel claim. It held that there was a material issue of fact about (1) "the existence of a specific and narrow promise by U.S. Bank that the bank had done its due diligence and that [Freeman's] prior termination would not affect his new employment"; (2) about "whether he changed his position in reliance on the bank's promise by informing several banks with whom he had been discussing open positions that he had accepted another offer and notifying clients of his change to U.S. Bank"; and (3) about "whether justice requires the enforcement of the bank's promise: Was Freeman forthcoming and truthful throughout the interview process to the best of his recollection, as he contends, or did he purposefully omit information about his prior termination to increase his odds of being rehired?" *Freeman v. U.S. Bank Nat. Ass'n*, 527 F. App'x 619, 620-21 (9th Cir. 2013).

The Court held a bench trial on May 5, 2014. The Court has carefully considered the testimony of each of the witnesses, the parties' trial exhibits, the parties' proposed Findings of Fact and Conclusions of Law, and the closing arguments of counsel. The following constitute the

Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings of fact may be deemed conclusions of law, or certain conclusions of law be deemed findings of fact, they shall each be considered conclusions or findings, respectively.

**III. FINDINGS OF FACT**

**A.  Freeman's Initial Employment with U.S. Bank**

1.      Freeman first worked at U.S. Bank from 1997 to 2000 as a Personal Banker. Def.'s Trial Exs. A-4, A-7; Dkt. # 72, ¶ 5.

2.      During this time, Freeman received recognition from the Bank for his sales accomplishments. Pl.'s Ex. 3. Freeman was promoted to Area Sales Manager in the Brokered Loan Division. Pl.'s Trial Ex. 4; Dkt. # 72, ¶ 6.

**B.  Freeman's 2000 Termination**

3.      In 2000, the Bank began investigating Freeman for committing a number of ethical violations and falsifying bank documents. Def.'s Trial Ex. A-7. The Bank concluded that Mr. Freeman had violated their code of ethics by having a family member process a second mortgage on his home, and that Freeman had falsified bank documents. *Id.*

4.      On March 6, 2000, Freeman was terminated from U.S. Bank for violating bank policies, including falsifying loan documents. *Id.*

5.      The Bank concluded that Freeman falsified sections of a U.S. Bank Advantage Line Application for two married U.S. Bank customers. *Id.*

6.      The Bank also concluded that Freeman falsified a verbal income and employment verification form for the same two customers. *Id.*

7.      On the original form, the two customers stated their incomes as $30,000 and $32,484. *Id.*

8.      Freeman changed the customers' Advantage Line Application by altering their annual incomes. *Id.* Freeman closed the two circles in the threes on the forms, making the numbers eights. *Id.* The stated income figures went from "30,000" and "32,484" to "80,000" and "82,484." *Id.*

9.      Freeman altered other information on the application, including the year the business started from "1999" to "1995," and the number of years as owner from blank to "4." *Id.*

10.     Freeman changed the responses of the customers regarding Personal Savings Account Balance and Savings Account Balance to larger numbers than originally produced by the couple. *Id.*

11.     Freeman added information to the portions of the application left blank by the customers as well. *Id.* He filled in "476,000" as the Annual Sales as Reported for Tax Purposes and "510,000" as the Approximate Net Worth. *Id.* Freeman also filled in the current business checking balance as "11,000" and current business savings as "13,400." *Id.*

12.     Additionally, Freeman falsified a Verbal Income and Employment Verification form for the same customers. *Id.* For one of the two customers, Freeman wrote that he spoke to Ken Clarkson at the Washington State Patrol on "6/11/99 at 4:45 PM." *Id.* He listed a phone number but the phone number was actually the same as the customers' telephone line that was listed on the Advantage Line of Credit Application. *Id.*

13.     Prior to terminating Freeman in 2000, U.S. Bank Human Resources representative, Sharon Bach, tried to verify the customer's income and learned that Washington State Patrol does not verify income. Dkt. # 72, ¶ 16.

14.      Freeman was never given an official reason for his termination or a termination letter. Ex. A, p. 10 (Freeman Test., Trial Day 1).[1] He remembered two areas of primary concern during his termination meeting. *Id.* at p. 3 (Freeman Test., Trial Day 1). First, that he "coached" customers about how to fill out loan applications, and second that he used a family member to process a personal loan for him. *Id.* at pp. 3-6 (Freeman Test., Trial Day 1).

15.      Both of these actions violated the Bank's ethics policy. Def.'s Trial Ex. A-7.

16.      Freeman altered the numbers the customers wrote on their form to higher numbers. *Id.* at p. 37 (Freeman Test., Trial Day 1). He did not call the Washington State Patrol, but still completed the Verbal Income and Employment Verification form.

17.      The falsified documents were discussed during the 2000 termination interview.

**C.  Freeman's Employment History**

18.      After his termination from U.S. Bank, Freeman worked for a number of different banks in a variety of roles. However, he was never employed with a single employer, aside from his own company, for more than three years.

19.      From U.S. Bank Freeman went to work for First Horizon Home Loans.

20.      After First Horizon Home Loans, Freeman went to work for a company called First Magnus for six months to a year, and then switched companies again and started with Sun West.

21.      Freeman and a business partner decided to create a small business called Freeman Lundt and Associates.

22.      In 2008, Freeman began working for Wells Fargo Bank as a Senior Commercial Real Estate Specialist. Dkt. # 72, p.3.

23.      In 2010, Wells Fargo decided to dissolve the division that Freeman was working in. *Id.*

---

[1] Exhibit A, which is attached to this Order, contains certified excerpts of the testimony elicited during trial days one and two.

**D. Freeman's Recruitment in 2010**

24.     In January of 2010, Wells Fargo offered him a separation agreement. Freeman accepted the agreement. Def.'s Trial Ex. A-8; Dkt. # 72, ¶ 22.

25.     Under that agreement, he received a severance package that allowed him to receive his base salary and benefits through July 28, 2010. Def.'s Trial Ex. A-8; Dkt. # 72, ¶ 23. However, to receive a salary through that time, Freeman could not accept new employment until after March 28, 2010. Def.'s Ex. A-8; Dkt. # 72, ¶ 23.

26.     While Freeman was looking for new employment, a bank manager at U.S. Bank named David Leonard called Freeman and asked him to apply for a job at U.S. Bank. Dkt. # 72, ¶¶ 26-27.     Leonard was recruiting new bankers to work for him at U.S. Bank. Leonard received a recommendation about Freeman from someone else in the industry. Ex. A, p. 45 (Leonard Test., Trial Day 2).

28.     In their early conversations Freeman told Leonard that he had previously worked at U.S. Bank and that he had been terminated from that position. *Id.* at p. 46 (Leonard Test., Trial Day 2); Dkt. # 72, ¶ 29.

29.     He told Leonard the exact reason that he was terminated was unclear. Ex. A, p. 46 (Leonard Test., Trial Day 2); *see also*, Dkt. # 72, ¶ 30. But, Freeman told Leonard that "[he] got terminated for violating the code of ethics, I did business with a family member. That was a no no. And number two, I coached a client on how to qualify for the Advantage Loan application." Ex. A, p. 12 (Freeman Test., Trial Day 1).

**E. Freeman's Disclosures to U.S. Bank about his Previous Termination**

30.     After the initial interview, Leonard and his manager, Joey Nix, interviewed Freeman for a second time. Dkt. # 72, ¶ 40. During this interview Freeman again told U.S. Bank that he was not sure of the exact reason he was previously fired. *See* Dkt. # 72, ¶ 42.

31.     The two possible reasons he remembered were coaching a client applying for a loan application and having his brother-in-law process his mortgage.

32.     Freeman did not disclose that what he meant by "coaching" was writing false information on a financial document. Further, Freeman submitted an employment application that stated, "I was terminated from US Bank 11 years ago for violating the code of ethics. My second mortgage was done by my brother in law (not supposed to do business with family) and I told a customer how to fill out their advantage line application (which is what we were trained to do at the time)." Def.'s Trial Ex. A-9; *see also* Dkt. # 72, ¶ 36.

33.     Freeman did not disclose to Ms. Nix or Mr. Leonard that he altered and falsified loan documents.

34.     Nix did not think Freeman was honest with U.S. Bank during the interviewing process in 2010.

35.     Leonard also felt that Freeman was not forthcoming about his previous termination from U.S. Bank. Ex. A, p. 49 (Leonard Test., Trial Day 2). When asked the following: "Mr. Leonard, when you reviewed the information that Ms. Bach sent to you, what did you conclude as to what Mr. Freeman told you during the interview process?", Leonard responded, "That what he was terminated for was not the things that he had told us." Id. (Leonard Test., Trial Day 2).

36.     When Nix and Leonard confronted Freeman about the document falsification he became defensive. He told Ms. Nix "that that couldn't possibly be the case, because [the income verification form] did not exist until well after 1999, and he felt that this was all part of a big forgery to terminate him, that it was doctored-up information to terminate him and to discredit him." *Id.* at p. 54 (Nix Test., Trial Day 2).

**F.  U.S. Bank's Due Diligence**

37.     Because Freeman's termination had occurred almost 10 years prior to his rehire, his original personnel file was destroyed.

38.     Before hiring Freeman, Leonard and Nix discussed Freeman's situation with Human Resources representative Jan Coonley. *See* Dkt. # 72, ¶ 47. Coonley was the Human Resources representative responsible for Leonard's group.

39.     Coonley, who was located in Los Angeles, was able to see that Freeman was marked as ineligible for rehire on the employee database, Peoplesoft, but she was unable to gather any more information from the internal site.  *See id.* at ¶¶ 48-51.

40.     Coonley directed Ms. Rodriguez and Ms. Schofield (human resources employees in the Seattle area) to search for any information related to Freeman's prior employment. *Id.* at ¶ 50. Ms. Rodriguez and Ms. Schofield were unable to find any information, such as a personnel file. *Id.* at ¶¶ 50-51.

41.     Three weeks after Freeman was hired, Coonley contacted Sharon Bach after receiving a tip from an employee relations worker that Bach had more information regarding Freeman's termination in 2000. *Id.* at ¶¶ 62-64.

42.     Bach attended Freeman's termination meeting in 2000. Def.'s Trial Ex. A-7. She memorialized her notes and impressions from that meeting. *Id.* However, Bach no longer supported the group Freeman was working for in 2000 and had moved offices from Seattle to Northgate. Bach also did not support the small business banking group that Freeman was hired into in 2010.

43.     Freeman did not remember that Bach was present during his termination meeting in 2000.

44.     Bach had additional information about Freeman that was no longer contained in his personnel file. Bach faxed a portion of Freeman's old personnel file to Ms. Coonley.

**G.  Promise that Freeman's Past Termination would not Affect his 2010 Employment**

45.     Freeman's testimony that Leonard and Nix promised him that his past termination would not affect his 2010 employment opportunity is not credible.

46.     Freeman could not recall the exact language of the conversation but believed that both Leonard and Nix assured him his past termination would not affect his 2010 employment. Freeman stated, "The commitment to me was that my prior reasons for termination in the year 2000 were not going to be a problem for me taking this new job. The past was in the past and we're starting over. And those words -- those words came from David, 'The past is the past,' you know." Ex. A, p. 18 (Freeman Test., Trial Day 1). Freeman stated that Leonard and Nix "assured me that my previous employment -- previous termination wasn't going to be an issue moving forward with the new job, that the past was in the past, and I get to start over with U.S. Bank." *Id.* at p. 33 (Freeman Test., Trial Day 1).

47.     Freeman's testimony was directly at odds with the testimony of Leonard and Nix. Neither Leonard or Nix told Mr. Freeman that he would not be terminated for any reason related to his past employment. For example, when asked "Did you ever tell Mr. Freeman that the past is in the past and nothing that had happened in 2000 would affect his current employment?" Leonard responded, "No." *Id.* at p. 50 (Leonard Test., Trial Day 2). Similarly, the following testimony was provided by Nix:

> Q: And did you ever say anything to Mr. Freeman that suggested he couldn't be terminated for some specific reason?
>
> A: No.
>
> Q: And did you ever promise him, "the past was in the past"?
>
> A: No.
>
> Q: Did you ever say anything like that?

1    A: No.

2    Q: All right. And did you ever tell him that his prior termination would not impact
     his future employment with US Bank?

3    A: No.

4

*Id.* at p. 56 (Nix Test., Trial Day 2).

5    48.    Freeman believed that Nix and Leonard were unhappy with his termination and thought

6    that he was getting "a raw deal." *Id.* at p. 22 (Freeman Test., Trial Day 1).

7    49.    Nix and Leonard, however, were not upset that U.S. Bank was terminating Freeman. Nix

8    was upset that Freeman did not disclose the entirety of the circumstances surrounding his past

9    termination. Leonard never told Freeman that he received a "raw deal":

10   Q: Did you tell him that?

11   A: That he got a raw deal?

12   Q: Yeah.

13   A: No.

14

*Id.* at p. 48 (Leonard Test., Trial Day 2). Further, Nix was the person responsible for firing

15   Freeman and she did not think he got a "raw deal":

16   Q: At any point did you think he got a raw deal?

17   A: No.

18   Q: And did you ever tell him that you thought he got a raw deal or that you thought the
     bank was doing something unfair?

19   A: No.

20   Q: At any point did you tell him the termination decision was
     unfair?

21

22   A: No.

23   Q: And who made the termination decision?

24

1     A: I did**.**

2 *Id.* at pp. 51-52 (Nix Test., Trial Day 2).

3

4                       **IV. CONCLUSIONS OF LAW**

5 **A.  Promissory Estoppel**

6         To succeed on a claim for promissory estoppel, a plaintiff must prove each of the

7 following five elements by a preponderance of the evidence:

8     (1) a promise which (2) the promisor should reasonably expect the promisee to
    change his position and (3) does cause the promisee to change his position (4)
9     justifiably relying on the promise, in such a manner that (5) injustice can be
    avoided only by enforcement of the promise.
10
*Havens v. C & D Plastics, Inc.*, 876 P.2d 435, 442 (1994) (internal brackets omitted) (quoting
11
*Klinke v. Famous Recipe Fried Chicken, Inc.*, 616 P.2d 644, 648 n.2 (1980)); *see* Restatement
12
(Second) of Contracts § 90 (1981). Here, Freeman has failed to establish elements (1)—that he
13
was made a promise by U.S. Bank and (4)—that even if a promise had been made, he would be
14
justified in relying on such a promise.
15
    1.  <u>Promise</u>
16
        The threshold requirement for Freeman's promissory estoppel claim is that there was a
17
promise made by U.S. Bank. *Havens*, 876 P.2d at 443 (quoting *Hunt v. Great W. Sav. Bank*, 774
18
P.2d 554, 557 n.4 (1989)). A promise is "a manifestation of intention to act or refrain from acting
19
in a specified way, so made as to justify a promisee in understanding that a commitment has been
20
made." *Id.* "[A]lthough promissory estoppel may apply in the absence of mutual assent or
21
consideration, the doctrine may not be used as a way of supplying a promise." *Id.*
22
        Freeman failed to establish that U.S. Bank made him a promise. First, Nix and Leonard
23
offered credible testimony that U.S. Bank never made the following promise to Freeman: that his
24

ORDER ON BENCH TRIAL GRANTING JUDGMENT IN FAVOR OF DEFENDANT - 11

1  past termination would not affect his 2010 employment. Their testimony did not corroborate Mr.

2  Freeman's testimony that he was told that "the past is in the past." Moreover, Ms. Nix's

3  testimony revealed that she, and not human resources, made the decision to terminate him after

4  additional evidence had come to light about his previous termination because she believed that

5  he had misrepresented the nature and gravity of his past unethical violations. She did not equate

6  "coaching a client to fill out an advantage line application" with fraudulently altering loan

7  documents. Ultimately, she made the termination decision because she felt that she had been lied

8  to during the hiring process.

9      Second, Mr. Freeman failed to identify the words that were used to promise him that

10  would not be terminated in the future, despite remembering the exact "promise that he would

11  have a laptop and a place to work." At most, Mr. Freeman recalled comments that the "past was

12  in the past" and vague assurances that his past termination would not affect his employment in

13  2010. However, all of this testimony was directly contradicted by testimony from Leonard and

14  Nix. Leonard and Nix affirmatively stated they made no such promise to Freeman.

15      Third, although Mr. Freeman argued that he had also been promised that the Bank would

16  do "its due diligence," the evidence and testimony presented at trial demonstrated that U.S. Bank

17  went through the proper channels to investigate the circumstances of Freeman's prior

18  termination. Nix and Leonard contacted the appropriate human resources representative, Ms.

19  Coonley, in order to obtain more information. Because of U.S. Bank's retention policy, Coonley

20  was unable to locate Freeman's full personnel file. Nix and Leonard hired Freeman based on the

21  information he provided about his prior termination, and the lack of any conflicting information.

22  However, once Nix and Leonard discovered the true reasons for Freeman's original termination

23  they felt Mr. Freeman was not truthful during the interview process.

24

1      At the core of a promissory estoppel claim is the requirement of a promise. Having found

2  no such promise from U.S. Bank, the Court finds that Freeman fails to satisfy the first element of

3  promissory estoppel.

4     2. <u>Justifiable Reliance</u>

5      Even if Freeman established that U.S. Bank made him a legally enforceable promise, he

6  has failed to demonstrate that he would have been justified in relying on U.S. Bank's promise. It

7  would not have been reasonable for Freeman to rely on a promise made by the Bank that "the

8  past was in the past." At the time the Bank allegedly made the promise, Freeman had not

9  disclosed to U.S. Bank that he falsified loan documents in 1999. Rather, he told the Bank on

10  numerous occasions that he only remembered "coaching" a client and doing business with a

11  relative. Freeman did not disclose that he falsified loan documents. Once that information came

12  to light, both Nix and Leonard felt that Freeman did not accurately or fully disclose the reasons

13  for his previous termination. Because Freeman did not disclose that he falsified loan documents

14  by altering numbers and entering demonstrably false information on the documents, he was not

15  justified in relying on any purported promise made by U.S. Bank that he would not be terminated

16  in the future based on the circumstances of his previous termination, should the details

17  surrounding his termination surface at a later date.

18                  **V. CONCLUSION**

19      Having fully considered the evidence presented at trial, the exhibits admitted into

20  evidence, and the argument of counsel, and being fully advised, the Court finds in favor of U.S.

21  Bank on Plaintiff's remaining claim.

22     //

23     //

24

1    The Clerk is directed to enter judgment accordingly.

2

3    Dated this 31st day of July 2014.

4

5

6

7                                          RICARDO S. MARTINEZ
                                         UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

```
 1

 2

 3

 4                  UNITED STATES DISTRICT COURT
            WEST DISTRICT OF WASHINGTON AT SEATTLE
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

RAHSAAN FREEMAN, an individual,    )
                                   )
                Plaintiff,         )  CASE NO. C10-01544RSM
                                   )
    v.                             )  SEATTLE, WASHINGTON
                                   )  May 5 & 6, 2014
U.S. BANK N.A. d/b/a U.S. Bank,    )
                                   )
                Defendant.         )  ▮▮▮▮▮▮▮ EXCERPTS
                                   )  OF TRIAL EXAMINATION

                 VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE RICARDO S. MARTINEZ
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff:     DANIEL F. JOHNSON
                         Breskin Johnson & Townsend PLLC


  For the Defendant:     JULIE S. LUCHT
                         Perkins Coie LLP


  Reported by:           NANCY L. BAUER, CCR, RPR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         (206) 370-8506
                         nancy_bauer@wawd.uscourts.gov

1   internal staff back in Minnesota, and I ended up getting a

2   broader scope of responsibility in Northern California and

3   Utah.  I was flying all over the place.

4   Q   And to whom did you report in this role?

5   A   Ryan Gipple.

6   Q   How did things go in this position for you?

7   A   Very well.  It was -- it was a new division that a lot of

8   upper management people were skeptical about.  They thought

9   that the numbers projected and earnings that we were going to

10  make in the first year, second year, and third year were

11  extremely aggressive, and they didn't think they were

12  realistic.

13  Q   And?

14  A   We ended up hitting our first year's projection in, like,

15  the first five months.  We exceeded it very fast.

16  Q   And it wasn't long after that that you were terminated,

17  right?

18  A   Yeah, the following year.

19  Q   Do you recall when that occurred?

20  A   I think it was in the springtime.  I don't remember exact

21  dates.

22  Q   You were again called into a meeting and asked questions?

23  A   Yes.

24  Q   Tell us, what was your reaction?  Tell us about that,

25  including your reaction.

 1   A    I got called in out of the blue to come meet with my boss,

 2   Ryan.  And I came in there, and from what I can remember, you

 3   know, it was Ryan, and it was a guy on the phone, a corporate

 4   security guy.

 5        And I truly do not remember Sharon Bach.  I just don't

 6   remember her.  But those were the two that stuck out to me.

 7   Ryan was the one who actually terminated me.  But it was a

 8   couple-hour, you know, meeting where we were going over past

 9   sales activities that I did.  So it was, you know, long after

10   this position.  I think there were activities from ninety --

11   maybe '97, clients I had worked with in the past, and closed.

12   Q    Which specific things do you recall being interrogated

13   about?

14   A    Well, what I recalled was that I violated the code of

15   ethics.  And the two things that I remember, that I felt like

16   they spent the most time on, was the coaching a client on how

17   to qualify for the Advantage Line program.  And then number

18   two, doing my second mortgage with my brother-in-law, because

19   you weren't supposed to do business with family.

20   Q    Why did you do it?

21   A    I had him process my loan because I didn't want anyone

22   else knowing my income levels.  I trusted him.  I didn't

23   think twice about it, because other employees dealt with

24   family members.  And there was nothing -- it was done

25   accurately, with a full documentation loan.  I got my

1    employee discount, and that was it.

2    Q   And the coaching -- I'm going to have you turn to

3    Exhibit 12.

4          MR. JOHNSON:   And the plaintiff offered 12.   I don't

5    think there's any objection to that one.

6          MS. LUCHT:   I don't object, other than it's a partial

7    exhibit.

8          THE COURT:   Thank you.   Exhibit 12 will be admitted.

9                     (Exhibit 12 admitted.)

10   Q   (By Mr. Johnson)   So I'm going to ask you to turn to the

11   second page, and tell us what this document is.

12   A   This was the U.S. Bank Advantage Line application, which

13   was a two-page application.   That program was a stated-income

14   business line of credit.

15   Q   So what was an Advantage Line loan?   What was the product

16   used for?

17   A   It could be used for whatever the business needed at the

18   time.   And I think the max the loan amount on it was $75,000,

19   or maybe $100,000 at the time.   But they can take those funds

20   and use them for whatever.   We didn't have any stipulations

21   back then on what they used the money for.

22   Q   What do you mean by "stated loan"?

23   A   Stated income.   We did not verify their income.   It was

24   whatever they put down on the application, so it was a

25   credit-score-driven product.

1    Q    Was that an unusual product?

2    A    Yeah, yeah, definitely.  It didn't fall right in line with

3    all the banking program products: no assets, no docs, stated

4    income.  It was -- if you have a credit score of 720 or

5    above, we'll give you money, basically.

6    Q    Do you recall this one?

7    A    Not really, but, I mean, looking at it, you know, it

8    brings back what the program was, how it worked, how we went

9    out and marketed it, but I don't remember the client

10   specifically.  A little bit after reviewing this, very

11   little.

12   Q    So what is it you think you did with respect to this

13   application that was determined to be wrong, that you were

14   interrogated about in 2000?

15   A    What I did was I coached the client on what they needed to

16   do to qualify for this loan.  And they left, I think on this

17   particular one -- I think we have another copy somewhere in

18   here of the actual versus the one that was submitted, and

19   they left areas of it blank.  And I think they were referred

20   to me by a wholesale broker.  And I think he actually gave

21   them a little bit of coaching, and so they left those areas

22   blank for me to help them figure out what they needed to do

23   to qualify for this.

24        And it was very common for us back then to either receive

25   these applications already filled out from the client or the

1   broker, or if we had things blank, we filled them in for the

2   clients while we were on the phone with them, and that's

3   where a lot of times the coaching came into play.  They maybe

4   filled it out, and, you know, based on my knowledge of this,

5   I kind of looked at it and knew they wouldn't qualify for

6   this, and how we were coached back then.  If that was the

7   case, we'd call them and say, "Hey, based on the numbers you

8   have here, you're not going to qualify for this loan.  Do you

9   still want me to send this in like this?"  And nine times out

10  of ten, they'd, you know, say, "Of course not." They'd say

11  no.

12      And at that point in time, you know, they'd say, "What do

13  I need to qualify here?"  And we'd tell them, "You're going

14  to have to be at this income level," you know, here, here,

15  here, and, "Do you want me to make those changes for you?"

16  You know, and then we'd make the changes and send it in and

17  get it approved.

18  Q   And that's what you came to understand you had done here,

19  and that you were being disciplined for it; is that right?

20  A   Correct.

21  Q   So can you -- I don't know if you can read this, but can

22  you give an example of how you would have likely coached this

23  person if -- if they came in, as you say, with these blanks?

24  A   Sure.

25      Under "gross annual sales," where it says "476," you know,

1    maybe they had a hundred thousand in there, and I knew they

2    had to be over 450 to qualify for the line of credit, to get

3    them the maximum amount of money they needed.  I would have

4    told them that.  "In order to get the maximum, we're seeing

5    clients at 450 and above qualify for this loan.  You're going

6    to need to have at least two years of business, your net

7    worth has to be X when you have Y.  Do you want to make that

8    change, or do you want me to make that change for you?"

9         If they didn't have any money, you know, in their account,

10   or something -- if I remember right, I don't think the bank

11   didn't like to see that, you know, very little liquidity, so

12   we would coach them, "Hey, you know, this number is going to

13   need to look better."  And so that was kind of the culture

14   and environment back then.

15   Q    All right.  So turn the page, then, to the next document,

16   marked USB132 at the bottom.  Can you tell us what that is?

17   A    This is a verbal verification form for employment.

18   Q    What was this for?

19   A    This was for personal business, so maybe for car loans,

20   equity loans, personal credit lines, credit cards, whatever.

21   Anything personal.  Nothing business.

22   Q    And did it have to do with the Advantage Line application

23   that we were just looking at?

24   A    Not at all.  Two completely separate things.

25   Q    But it had the same client's name, right?

1    A    Yes.

2    Q    So do you surmise they were seeking a different loan?  Is

3    that what results in having this document created?

4    A    Yeah.  A lot of times when we did these Advantage Lines,

5    we also did personal credit lines for them, credit cards, car

6    loan.  I mean, you name it.  We were taught to cross loan

7    anything that we could that they might qualify for.

8    Q    And is this your handwriting?

9    A    It looks to be my handwriting, yes.

10   Q    And would there be any documentation for this personal

11   line of credit that this is related to?

12   A    No.  A lot of those were stated income also.  And also, at

13   times, we just got approvals kicked out to us on the system.

14   We would -- we had lists to call, to say, "Hey, by the way,

15   do you know you're preapproved for a $25,000 personal credit

16   line?"  And there was nothing needed.  They'd just say yes or

17   no, and if they wanted the line of credit, we booked it, and

18   they had it.  Very, very different than today.

19   Q    And do you know where you got the information that you

20   wrote on this form?

21   A    I believe in this case -- I probably got this from the

22   broker that sent me this client.

23   Q    When would you accept income verification like this from a

24   broker?

25   A    A lot.  Yeah, quite -- quite a bit.  I mean, even after we

1    had the broker loan division opened up, there were certain

2    brokers that we allowed to do these, that we vetted, and the

3    bank felt, you know, okay with these guys as far as the risk,

4    and we were willing to -- allowed to do that business.  But

5    in the beginning, everybody did it.

6    Q    And if you got this information from a broker, that means

7    you did not call the Washington State Patrol to see if this

8    individual was employed there and how much he made?

9    A    Correct.  I could have gotten this off of the 1003, which

10   is their application, and in a 1003 mortgage, it has all this

11   information already listed in it.

12   Q    "Their application."  Whose application?

13   A    The mortgage broker or the wholesale company.

14   Q    Okay.  Is there anything on this document that you knew

15   was false?

16   A    No, not -- not that I knew.

17   Q    Do you remember discussing this in the interrogation with

18   U.S. Bank in March 2000?

19   A    Not really.  When I see it now, after going through this

20   process, you know, I can -- I know that this was a company

21   that went hand in hand with what I was doing for the client

22   back then.  We were doing multiple products for this one

23   particular client, business and personal.  But I don't

24   recollect the specific conversation about this.

25   Q    And this is not something that you mentioned later in

1   2010, when you were talking to the bank about coming back to

2   work for them?

3   A    Not to my knowledge.   There were 12, 15 things that were

4   discussed.

5   Q    Do you remember any others, beside -- we've now talked

6   about your own second mortgage you did with your

7   brother-in-law, the Advantage Line application that's in this

8   exhibit, and this income verification form.  Do you remember

9   any others?

10  A    No.   I only know there were multiple things discussed,

11  because of what documentation we have now.

12  Q    So what happened after the interrogation concluded?  What

13  happened next?

14  A    I was asked to leave the room.  I think they called me

15  back in maybe ten, fifteen minutes, and then they terminated

16  me.   And when they terminated me, they said, "We're deciding

17  to end your employment here, and turn in your laptop and

18  leave the keys."  That was it.  They didn't give me reasons.

19  I didn't get a termination letter.  I just -- I just left

20  shocked, crushed, you know, demoralized.  I'd never

21  experienced anything like this before, especially when I was

22  at such a high in my career performance-wise.  This was

23  definitely a valuable learning lesson.

24  Q    How old were you?

25  A    I think I was 23 at the time. Your folks to see if this is

 1    even something that's realistic."  And I said, "I don't know

 2    if this meeting is going to be a good use of our time," and

 3    he said, "Just come meet me.  You come highly recommended, so

 4    let's talk."

 5    Q    And did you?

 6    A    Then I came to Bellevue, and I had an interview with him.

 7    Q    How long was that?

 8    A    You know, probably at least an hour or more.  I don't

 9    remember.

10    Q    How did you feel about being recruited back?

11    A    You know, on one hand, it was great.  It made me feel

12    good.  Because I got terminated from that bank, and it's the

13    one spot in my career that, I mean, if I could fix it, change

14    it, I totally would.  I felt like that would be my

15    opportunity to do that.  I said, "I totally believe

16    everything happens for a reason."  And so I talked to a

17    couple of people that knew my situation at U.S. Bank, that

18    still work there, too, and I said, "What do you think?"  And

19    they're, like, "Man, get back here.  You'd be great on the

20    team."  And so I -- I did.  I felt really good.  But on the

21    same end, too, I was cautiously optimistic, because I know

22    how it works.  I've been in banking for a long time.  When

23    somebody is ineligible for rehire, you have to have a very

24    compelling case, or else you get HR to, like, "Go ahead and

25    hire that person."  So like I said, I was cautiously

1   optimistic.

2   Q   And so you met with David Leonard.  Did you talk in detail

3   then about your previous termination?

4   A   Yes, definitely.

5   Q   What did you say?  Or what did he say?

6   A   He asked me what happened, you know, "Tell me what

7   happened."  And I told him, "It was a long time ago, here's

8   what I remember.  I got terminated for violating the code of

9   ethics.  Number one, you know, I did business with a family

10  member.  That was a no-no.  And number two, I coached a

11  client on how to qualify for the Advantage Loan application."

12  I also told him that back then it was pretty normal.

13      I also told him about my investigation in 1999, and said

14  how I was accused of accepting money under the table, and,

15  you know, I had a lot of -- a lot of bankers back then that

16  were pretty jealous, you know, didn't like me.  Still, you

17  know, I knew that was going to be a challenge, coming back to

18  the bank.  But, you know, I had that negative connotation on

19  me at U.S. Bank.

20  Q   Let me have you look at what's been marked as Exhibit 9.

21  A   Okay.

22  Q   Can you just identify that for the record?

23  A   This is my application that I made online to U.S. Bank for

24  the 2010 job.

25  Q   At David Leonard's request?

1    A    Correct, yeah.  This came after we had met.  Let me see.

2    I don't know what the exact date is.  Okay.  It looks like it

3    was on February 9th.  So I had already met him prior, prior

4    to filling this out.  I had met him and Joey, possibly, the

5    second time around, before I even filled this out.  I can't

6    remember.  They moved really fast.

7              MR. JOHNSON:  Plaintiff offers Exhibit 9.

8              MS. LUCHT:  No objection.

9              THE COURT:  Exhibit 9 will be admitted.

10                      (Exhibit 9 admitted.)

11   Q    (By Mr. Johnson)  Just flipping to the page marked USB165

12   at the bottom.

13   A    Okay.

14   Q    Did you disclose there something about your termination,

15   and answer their questions?

16   A    I did.  It says, "Have you ever been discharged without

17   notice or allowed to resign prior to termination in

18   conjunction with previous employment?  Please describe the

19   circumstances below."  And my answer was, "I was terminated

20   from U.S. Bank 11 years ago for violating the code of ethics.

21   My second mortgage was done by my brother-in-law.  I'm not

22   supposed to do business with family.  And I told customers

23   how to fill out their Advantage Line application, which is

24   what we were trained to do at the time.  Since then, I've had

25   no other terminations from any other company."

1    Q    Okay.  Now, you started to say that you had another

2    interview with David Leonard and someone else?

3    A    Joey Nix, who is here today.

4    Q    And what occurred -- describe that interview, please.

5    A    The meeting was very much like the first one with David

6    Leonard, where I explained a lot about my past at U.S. Bank,

7    and how I thought that was going to be a roadblock, you know,

8    coming -- coming back.  Also, talked about my -- what I had

9    done since U.S. Bank and my performance, and we went over the

10   jobs I had on my resumé.  And outside of that, that was it.

11   They still wanted -- after that, they still wanted to proceed

12   in bringing me back, and I said, you know, "You guys are

13   going to have to do your due diligence, and look at my files

14   with U.S. Bank, and let me know, because I'm still talking

15   with other banks."  And I wasn't counting on U.S. Bank,

16   because, honestly, I didn't think I was going to be able to

17   be rehired.  I've been through this process as the hiring

18   manager, and it's a tough thing to get past.

19   Q    What was your impression about Ms. Nix and Mr. Leonard at

20   that point?

21   A    My impression was good.  You know, I thought I would work

22   well with them and their team.  I understood U.S. Bank's

23   environment, their culture, and I wholeheartedly thought I

24   was going to be a top producer there.  And like I said, for

25   myself, I felt really good, because I was getting a chance to

1   go back.

2   Q   Did either of them use the term "due diligence" with you?

3   A   Yes, yes, definitely.

4   Q   What did they say?

5   A   I don't remember the exact words, but multiple times, in

6   person and on the phone, especially with David, because I had

7   more communication with David than Joey, both of them said

8   they were going to look into, you know, my past with the

9   bank, and let me know if they were going to be able to

10  proceed, and not to give up on, you know, this job.

11  Q   And did you believe them?

12  A   Wholeheartedly.

13  Q   Okay.  And then what happened?

14  A   They ended up coming back to me within some period of

15  time, I don't know exactly, and telling me that they were --

16  they were going to rehire me, and that my background check

17  came back clean, and my past employment and termination

18  reasons at U.S. Bank were not going to affect this new job,

19  my new employment there.

20  Q   Did you ask about that when they told you they wanted to

21  hire you?

22  A   Definitely, yeah.

23  Q   Do you remember what you said?

24  A   I don't remember how I asked it, but I definitely asked it

25  and I remember David Leonard saying hey you're good, you're.

1    A    Okay.

2    Q    Can you identify that for the record?

3    A    Yes.   This is a U.S. Bank compensation plan back from

4    2010, when they hired me.

5    Q    Are you looking at 11?

6    A    Exhibit 11, yes.

7    Q    Dated March 3rd?

8    A    Yes, March 3rd, 2010.

9    Q    Is this a letter you received from U.S. Bank?

10   A    No.   This is the plan that Dave gave me.   Oh, I'm sorry.

11   You're right.   This isn't the comp plan.   This was my offer

12   letter.

13   Q    Okay.   And did you receive this letter from U.S. Bank?

14   A    Yeah, I believe so.

15   Q    And was that before or after David Leonard had talked to

16   you and offered you the job?

17   A    Oh, this was after, definitely.

18   Q    What did you understand was the purpose of this letter

19   when you received it?

20   A    To offer employment to me.   It's the green light to come

21   back to U.S. Bank; that they had done their due diligence,

22   and I was eligible for rehire, and my past termination wasn't

23   going to affect my future employment.

24   Q    So did you understand that you had to accept this letter

25   again, after having talked to David Leonard?

1   A    I don't know.

2   Q    What's the second page there?

3   A    The second page is -- looks like the terms of my

4   employment, start date, job rate, title, et cetera.

5   Q    Your starting salary was $70,000?

6   A    Correct.

7   Q    Did you negotiate that?

8   A    The typical salary for the job, I think, was $60,000

9   across the board.  And the reason why their salaries are

10  lower is because their incentive plan is so aggressive.  You

11  can make your salary in a quarter.

12      So I told David, when we were discussing -- before this

13  letter came, you know, I had a higher salary before that, I

14  had higher salary opportunities that I was looking at, and I

15  wanted to know if I needed to do anything more.  And he said

16  he ran it up the chain.  It had to be approved by a man named

17  Ted.  I thought it went to Joey.  He said that wasn't

18  something that they regularly did.  He gave me an increase in

19  my salary, and David asked me not to mention that to any of

20  the other bankers.

21  Q    Did you read all the text on this first page of this

22  letter?

23  A    Possibly.  I thought it was standard operating verbiage.

24  Like I said, I've been a hiring manager for many years, so I

25  probably honestly didn't pay a ton of attention to this.

 1   Q    And do you remember whether you read the last paragraph

 2   that talks about at-will employment?

 3   A    I don't remember that.  Like I said, it's pretty standard

 4   verbiage for banks.

 5   Q    At the time that you accepted employment to go back to

 6   U.S. Bank, at the time that you received this letter, did you

 7   understand that U.S. Bank had made a commitment to you?

 8   A    Yes.

 9   Q    What was the commitment?

10   A    The commitment to me was that my prior reasons for

11   termination in the year 2000 were not going to be a problem

12   for me taking this new job.  The past was in the past, and

13   we're starting over.

14        And those words -- those words came from David, "The past

15   is the past," you know, "We're going to..."

16            MR. JOHNSON: I think I forgot to offer Exhibit 11 in

17   evidence.

18            MS. LUCHT:  No objection.

19            THE COURT:  Thank you.  11 will be admitted.

20                    (Exhibit 11 admitted.)

21   Q    (By Mr. Johnson)  And when did you start working at U.S.

22   Bank the second time?

23   A    I think it was April 1st.  Yeah, April 1st.

24   Q    And you talked a little bit about what you were doing in

25   the interim.  Can you give just a little more detail about

1   how it is that you were working to build business for U.S.

2   Bank in March, before you formally started?

3   A    I went out to all my centers of influence, which are CPAs,

4   attorneys, commercial real estate agents, other bankers, just

5   all the people in my network as clients, that I thought I'd

6   be able to bring over to U.S. Bank as clients at some point

7   in time.  They where people that would generate client

8   opportunities for me, and I started laying the groundwork,

9   because there were deals out there, and there were deals at

10  Wells Fargo that were falling apart, and I knew all the

11  bankers there, and they were trying to find homes for

12  clients.  And so, you know, I had a lot of opportunities out

13  there to close deals.  And I understood, like I said, the

14  U.S. Bank major -- I understood their lending policy, and so

15  I thought I'd be able to hit the ground running and bring in

16  some new business barely through the gate.

17  Q    Describe your first few weeks of work at U.S. Bank.

18  A    It was me meeting some of the other bankers, going to

19  training in California, and me doing exactly what I'd just

20  stated:  Meeting with my centers of influence in my network,

21  trying to bring business in.

22  Q    And then what happened?

23  A    I got a call when I was in California from David Leonard

24  while I was in training, saying, "Hey, I need to talk to you.

25  Your past termination is coming up again."  And I was

1   shocked, and said, "Why?  Why now?  I thought this was all

2   done."

3       And I don't remember exactly what he said, but he told me,

4   "There's this Sharon Bach lady that found out you're back in

5   the bank, and she has some files on you, or something, and we

6   need to talk to you as soon as you get back here."  So I

7   believe I flew back, like, the next day, which I think it was

8   a Thursday, and came up to Bellevue and met with David and

9   Joey, and they were having conversations.  They were on the

10  phone in Joey's office with maybe Sharon, HR people, I don't

11  know.  I wasn't allowed to go in there.

12      But when I got there, David told me, "Yeah, this thing in

13  1999 came up, and you were part of this, this guy that U.S.

14  Bank took to court for damages," and it was that Gary Dunn

15  guy, who accused me of being paid under the table and closing

16  fraudulent loans.

17      And my name was in the court transcripts.  And this was

18  something I already told them about.  And so we went back and

19  forth, and they came back and said, "Okay.  No.  That's off

20  the table.  That's fine," you know, and I said, "I was

21  exonerated of that, and then promoted after that, and I told

22  you about this.  Why is this an issue now?"

23      And then they just kept coming back with more things.  Now

24  it was, "You did loans for clients who didn't have equity in

25  their house."  Well, we did 125 percent loans.  They were,

1    actually, one of our more competitive loan products.  That

2    was one of the things that came up.

3        I don't remember if they actually mentioned the Advantage

4    Line deal.  I don't think we talked about that until the

5    following week, when they actually terminated me.  But it

6    was -- it was really -- it was just really odd and weird to

7    me.

8        And so they put me on administrative leave, and then the

9    following week, I believe it was Monday, David and Joey

10   called me and told me that I had to be terminated.  That's

11   when some of these other things came up and why it didn't

12   make sense to me when they were saying, "Yeah, there's this

13   Advantage Line and there's this verbal verification form that

14   you filled out for this program."  And that's when I was

15   saying that doesn't make any sense, they don't go together,

16   they're two completely different things.  And I couldn't see

17   anything because I was on the phone.  So I was trying to put

18   this all together in my head and trying to figure this out.

19       And after talking to them for, I don't know, maybe an

20   hour, at the end, I think they -- one of them may have given

21   me the person's number to call to appeal this.  And so I

22   followed the appeal process.

23       But, yeah, I was shocked.  I just can't believe this.

24   Q   Did you speak to anyone else about this besides David

25   Leonard and Joey Nix?

1    A    About?

2    Q    About the new information.

3         Let me back up.

4         You've described what it sounds like is two

5    conversations, one in David Leonard's office, where he and

6    Joey were coming in and out, on a, I think you said, Thursday

7    or Friday?

8    A    It might have been just David.  I can't remember.  But I

9    know I saw the two of them.

10   Q    And then you also described a phone call the following

11   Monday, where they ultimately terminated you?

12   A    Correct.

13   Q    Did you have any other conversations in between or around

14   that that related to the termination?

15   A    Not that I remember.

16   Q    And was anybody involved in either of those two

17   conversations besides you and David and Joey?

18   A    Not that I recall.

19   Q    And what did they seem to think about this?

20   A    They thought I was getting a raw deal.

21   Q    Did they say that?

22   A    Yeah.  And they were upset.  There were other expletive

23   words used about what was going on, and the compelling

24   statement from them was that they didn't agree with it, and

25   that they thought Sharon Bach had it out for me, that she was

1   extremely difficult to deal with.  I think I was told she

2   produced handwritten documents, new documents, new

3   information that had, you know, responses from me that were

4   one-word responses, and they thought it was weird and it just

5   didn't seem right.

6   Q    That's what they said to you?

7   A    Yeah.

8   Q    In the conversation in which they terminated you?

9   A    Correct.

10  Q    Over the phone?

11  A    Yes.

12  Q    And you said this conversation lasts about an hour,

13  approximately?

14  A    Yeah.

15  Q    And you talked about documents on that phone call?

16  A    Yeah, we did, that that's, like I said, when they were,

17  you know, mentioning some of the items that were brought to

18  their attention, and I was trying to, you know, dispute them

19  or trying to understand what they were looking at.  It

20  just -- like I said, it didn't make sense.

21  Q    And they brought up the Advantage Line loan application?

22  A    Yeah.

23  Q    And was their understanding that that was what you had

24  told them, before they hired you, about?

25  A    Yeah.  And I also told them about the 1999 investigation,

1   and that still came back, you know, during this process.

2   Q   Uh-huh.  And did they ever mention the income verification

3   form?

4   A   Yeah.

5   Q   That we looked at earlier?

6   A   Yes.

7   Q   And what did you say about that?

8   A   I said that that doesn't go together with the Advantage

9   Line application.  They're two completely separate deals.

10  Q   So had they told you over the phone that they were

11  connected?

12  A   Yeah.  They said, "There's this client that you filled

13  out -- that you did that Advantage Line for, and you filled

14  out this verbal verification form that went along with

15  this -- you know, this program," and that's when I educated

16  them on, no, they're two separate things, two different

17  deals.  But I didn't even remember, you know, that instance.

18  I didn't even remember that I did a personal credit line for

19  those guys, or loan, or whatever that form was used for.

20  That's why I -- you know, when I first met them, I didn't

21  even remember the client.  I couldn't point them out in a

22  lineup to save my life.  I've dealt with so many clients, so

23  many things, and there were a lot of things brought up in my

24  termination interview in 2000.  And I was never told

25  specifically why.  Like I said, the thing that stuck with me

1 | most was doing the business with the family and then the

2 | Advantage Line.

3 | Q   And did you ever talk to Sharon Bach or Jan Coonly during

4 | this transaction where you got fired?

5 | A   No.  I talked to -- I don't think it was Jan -- but

6 | somebody in HR.  Maybe Stephanie Rodriguez, or somebody like

7 | that was the person I could call to appeal.

8 | Q   And you did that after you'd been fired?

9 | A   Yeah.

10 | Q   What did you understand was the reason they were

11 | terminating you again?

12 | A   Because of my past employment in 2000.  The termination

13 | reasons for my 2000 termination, and they said that -- I'm

14 | trying to remember.  There were -- there were more -- more

15 | things, or something.  I don't know.  But the bottom line is,

16 | it was all connected to my prior employment in 2000.

17 | Q   Let me have you look at Exhibit 14.

18 | A   Okay.

19 |       MR. JOHNSON:  We'll offer that into evidence, if

20 | there's no objection.

21 |       MS. LUCHT:  No objection.

22 |       THE COURT:  Thank you.  14 will be admitted.

23 |                 (Exhibit 14 admitted.)

24 | Q   (By Mr. Johnson)  What is this Exhibit 14?

25 | A   My termination letter in 2010.

1    Q    And did you ask for this?

2    A    Yeah they mail it to me.

3    Q    Who did you ask?

4    A    The gal I spoke with about appealing I said I want a copy

5    of my termination letter and this is what she sent me and

6    just by looking at this, I was terminated on 4/26/2010 for

7    misconduct and violation of policy.  I didn't have any

8    misconduct when I came back the second time and I was there

9    for such a short period of time I knew this just went along

10   with what they told me on the phone, that it was for my past.

11   Q    In that conversation with Joey and David Leonard when they

12   told you they were going to fire you again, did they offer to

13   help you in any way?

14   A    They did.  They said that they felt really bad about this

15   and I could use them for references.

16   Q    Who said that?

17   A    I don't remember which.  I know David for sure.  I don't

18   know if Joey did.  I can't remember.

19   Q    Was the conversation one in which you understood they were

20   on the phone together the whole time?  They were both there?

21   A    Yeah.

22   Q    And did you have any further contact with either of them

23   after the termination?

24   A    Joey no, David, yes.

25   Q    What was your contact with David?

1    Q    And what did that severance provide you with?

2    A    I was paid through -- I believe it was December of 2013.

3    Q    Just your regular base salary?

4    A    Correct.

5    Q    Okay.  And what have you been doing since then, besides

6    getting married?  You got married, right?

7    A    Yeah.  I got married.  I graduated from PBCS last August.

8    Finished that.  Immediately when I found out my job was going

9    away, and I told them I wasn't going to accept the New York

10   job, which kind of caught them by surprise, I started talking

11   to everybody I know in the banking world, and trying to

12   figure out, you know, where the next place to go was going to

13   be for me.  So I was having interviews before I was even out

14   of Key Bank, in June.

15   Q    And how did it go?

16   A    Interviews went great.  I got -- I was getting pursued,

17   just like when my Wells Fargo jobs disappeared, and I was

18   getting called about lots of leadership opportunities all up

19   and down the West Coast and Midwest areas.  I had a lot of

20   banks that I went down the path with, pretty lengthy, where

21   they were flying me around for interviews, and would get down

22   to the end of the line where, you know, it comes time to make

23   a decision, or when they do their background checks, and then

24   everything goes cold and just stops, and I believe that to be

25   because of the information that's online about me pertaining

1   to this case.  So it's been very difficult to secure

2   employment in the banking industry.

3       And I've been verbally told and received it in writing

4   from other hiring managers from different banks saying, "I'd

5   love to have you on board.  I know you'd rock it here, but I

6   can't do anything until your case is completed."

7   Q   Your case against U.S. Bank?

8   A   Correct.

9   Q   So no banking job, still?

10  A   No.

11  Q   And what have you decided to do instead?

12  A   Try to take my, you know, my destiny in my own hands.  So

13  I went and got my commercial real estate license in January.

14  And I've since become the managing director for Coldwell

15  Bankers' merger and acquisition division, and it's something

16  that they want to grow nationwide.  It's going to take some

17  time, but I'm going to try to build this from the ground up.

18  Q   When were you given that job?

19  A   Maybe about two weeks ago is when it was official.  I've

20  been in conversations with Coldwell Banker for the last two

21  months.  I've been in conversations with Kidder Mathews, and

22  also someone else in the same role.

23  Q   You're not actually being paid a salary in that position?

24  A   No.  It's 100 percent commission.

25  Q   What made you decide that was the right thing to do?

1   A    I didn't really, you know, have any other options.  The

2   banking -- the banking doors are closed right now.  And, you

3   know, like I said, this is -- I have no choice but to take

4   this into my own hands and try to do whatever -- whatever I

5   can.

6   Q    What is the outlook, in your mind?  What are you hoping

7   happens with mergers and acquisitions with Coldwell Banker?

8   A    My outlook is optimistic.  You know, there's going to be a

9   lot of business of selling in the next decade in the business

10  world.  So I think there's going to be opportunity there, but

11  I have to go out there and make it happen and build this

12  team.

13       And I think that somewhere in the 24- to 36-month

14  timeframe is when I'll really start earning some -- some

15  decent income, maybe comparable to where I was, and hopefully

16  exceeding it down the road.

17  Q    Okay.  If you want to summarize at this point the harm you

18  feel like was caused to you by being terminated for the

19  second time by U.S. Bank.

20  A    You know, really, really difficult.  I mean, I was

21  devastated enough the first time.  And, you know, I -- I

22  looked at the second time as a second chance and an

23  opportunity to really go back and make things right with them.

24  And getting -- you know, getting fired the second time was

25  brutal and very difficult.  And since my job dissolved at

1    Key.

2              MR. JOHNSON:  Your Honor, the only objection I have

3    is that I don't think it's relevant, that these various

4    employment documents reciting the at-will doctrine from ten

5    years, twelve years earlier.  And to the extent we keep doing

6    this, which I think we will, I think it's a waste of time and

7    irrelevant and redundant.

8              MS. LUCHT:  Your Honor, I think it goes to whether or

9    not he understood that employment with U.S. Bank was at-will.

10             THE COURT:  The objection will be overruled.  A-2

11   will be admitted.

12                        (Exhibit A-2 admitted.)

13   Q   (By Ms. Lucht)  All right.  Am I correct that A-2

14   indicates that, "I understand the amendment does not create

15   any contract rights or alter my status as an at-will

16   employee"?

17   A   It looks like it.

18   Q   All right.  Will you take a look at Exhibit A-3, please?

19   Do you recognize that document?

20   A   No, I don't.

21   Q   Is that your signature on the document?

22   A   Yeah, that's my signature.

23   Q   Okay.  And so you signed this in May of 1997; is that

24   correct?

25   A   Correct.

```
 1                 MS. LUCHT:  I move to admit Exhibit A-3.

 2                 MR. JOHNSON:  Same objection.

 3                 THE COURT:  Overruled.  A-3 will be admitted.

 4                       (Exhibit A-3 admitted.)

 5   Q   (By Ms. Lucht)  All right.  And this is a handbook,

 6   Personnel Policies and Procedures, receipt; is that correct?

 7   A   I don't see where it says that.

 8   Q   Well, at the top, it says, "I have read the personnel

 9   policies and procedures section of the U.S. Bank handbook."

10   A   Okay.  Gotcha.

11   Q   And, again, this confirms that it's at-will employment; is

12   that correct?

13   A   Correct.

14   Q   All right.  And can you turn to Exhibit A-4, please?  Do

15   you recognize that document?

16   A   It looks like my letter of employment after First Bank

17   bought U.S. Bank.

18   Q   And that's because there was a bank merger, and you

19   continued on; is that correct?

20   A   Correct.

21                 MS. LUCHT:  I move to admit Exhibit A-4.

22                 MR. JOHNSON:  Same objection.

23                 THE COURT:  Overruled.  A-4 will be admitted.

24                       (Exhibit A-4 admitted.)

25   Q   (By Ms. Lucht)  And this letter told you your employment
```

1   with the new organization or its affiliate will be employment

2   at will, correct?

3   A    Correct.

4   Q    And I'd like you to take a look at Exhibit A-5.  Do you

5   recognize that document?

6   A    This was the confirmation of the offer they made to me in

7   2010.

8   Q    Okay.  And after you received this, you accepted

9   employment with U.S. Bank, correct?

10  A    I did.

11          MS. LUCHT:  I move to admit Exhibit A-5.

12          MR. JOHNSON:  No objection.

13          THE COURT:  A-5 admitted.

14                  (Exhibit A-5 admitted.)

15  Q    (By Ms. Lucht)  Okay.  And at the bottom of this letter --

16  you read this letter, correct?

17  A    I don't even know if I really read this.  I might have

18  skimmed through it and -- I don't know.  I don't remember.

19  It's a boilerplate confirmation of an offer.  Pretty

20  standard.

21  Q    And it's just one page, right?

22  A    I think so.  Yeah.

23  Q    It's an addendum about the salary; is that correct?

24  A    Yes.  It's a two-page document.

25  Q    And at the bottom paragraph it says, "This letter does not

1   create a contract of employment.  Your employment at U.S.

2   Bank will be at will and may be terminated by you or U.S.

3   Bank at any time with or without notice, for any reason."  Do

4   you see that?

5   A    I see it, yes.

6   Q    All right.  And can you tell me, did Mr. Leonard or

7   Ms. Nix make any promises to you during the interview process

8   or prior to you accepting employment with U.S. Bank?

9   A    They assured me that my previous employment -- previous

10  termination wasn't going to be an issue moving forward with

11  the new job, that the past was in the past, and I get to

12  start over with U.S. Bank.

13  Q    Do you recall being deposed in this case, in September,

14  with your counsel there, September of 2011?

15  A    Yes.

16  Q    Can you turn to page 134 of the deposition?

17  A    Okay.

18  Q    And do you see a line 6? "QUESTION:  And did Mr. Leonard

19  or Ms. Nix make any promise to you during the interview

20  process or prior to you accepting employment with U.S. Bank?

21  "ANSWER:  Promise of."

22      There was an objection.  And then the question:  "Did

23  Ms. Leonard or Ms. Nix make any promises to you during

24  the interview process or prior to you accepting employment

25  with U.S. Bank?"  There was an objection, and then you said,

```
 1      There's a file, there's a record of me, you know, in the
 2   system.  I'm pretty sure it said I wasn't eligible for rehire
 3   and the reasons there.  So I knew they had to -- they had to
 4   go down their path and talk to the right people and find out
 5   if I could, indeed, get an exception to be rehired?
 6   Q   But you actually were present at your termination,
 7   correct?
 8   A   In 2000?
 9   Q   Yes.
10   A   Yes.
11   Q   So you, presumably, know the facts regarding your 2000
12   termination, correct?
13   A   No.  I mean, I remember, like I said, the two things that
14   stuck out that I think we spent the most time on, were doing
15   business with a family member, and also the Advantage Line,
16   the deal I did for those clients.
17      I don't remember, you know -- I didn't remember at the
18   time when I met with them anything else.  As I got to see
19   some of these documents, some things have kind of come back,
20   but I still don't -- they never told me, "You're being
21   terminated for X, Y, Z."  They just said, "We're not going to
22   continue your employment here," and I didn't receive a
23   letter.
24   Q   And they questioned you for two hours, including showing
25   you the documents that we've discussed, the verbal income
```

1    verification form and the Advantage Line credit application,

2    correct?

3    A    Like I said, to the best of my knowledge.  I didn't

4    remember the exact timeframe or the exact line of questioning

5    on everything.  I told them exactly what I did remember.

6         And I actually said, you know, "If there's anything else,

7    you know, you guys have a file on me, you have a history, so,

8    you know, you're going to find it."

9    Q    Do you remember Joey Nix asking you, "Is there anything

10   else I need to know? "

11   A    I don't.  She might have, but I don't remember exactly.

12   But I would have responded if she did.  I would have said,

13   you know, "I told you what I remember.  You guys have the

14   file on me, so, you know, tell me what you find, tell me how

15   this goes."

16   Q    And you were only 24 when you were terminated in 2000,

17   correct?

18   A    Twenty-three.

19   Q    Did you not turn 24 in January of 2000?

20   A    No.  I started when I was 21, in '97.  I thought I was 23

21   when they terminated me.

22   Q    Well, regardless, you were fairly young, correct?

23   A    Yeah, I was very young.

24   Q    And you testified that you were doing phenomenally and had

25   all this success; is that correct?

1    A    I did well there, yes.

2    Q    So was it memorable when you had to be questioned for two

3    hours about ethical violations, and then fired?

4    A    I told you what I remember to the best of my ability.

5    That day was a blur.  It was, you know, from left field, and

6    just something that I never, ever experienced.  You know, at

7    that time I was young, and I just stunned, and it was tough.

8    Q    And you indicated that other people at the bank were

9    jealous of you because of your success, correct?

10   A    Sure.

11   Q    And you suggested that that might have been why you were

12   investigated in 1999; is that correct?

13   A    Possibly.  I don't know.  I know why it was.  I know why

14   it happened, and that is because that broker guy went to a

15   local branch in California, and then it ran up through the

16   state manager.  But I was audited many times.  And I got

17   audited every day by other bankers, because we could all see

18   each other's sales activity.  We had a system back then where

19   anybody could go on and look at what you were doing.  And

20   then there were bankers, just like I was, who were working on

21   the same plan, and they could do the math and see what I was

22   making.  And so, yeah, there was cruel talk, there was, you

23   know, all kind of things.  Plus, I was very young, and there

24   weren't too many people that were happy about that.

25        When I got promoted into my role, my boss told me that a

1    correct?

2    A    Uh-huh.

3    Q    And then within the same week, there were verbal income

4    verification forms that you completed, correct?

5    A    Correct.

6    Q    And those indicated an income level consistent with the

7    $80,000, not the $30,000, correct?

8    A    Yes.

9    Q    And that was false, correct?

10   A    Yeah.

11   Q    Because the true income was the $30,000 that the customer

12   originally put on the loan application, correct?

13   A    To the best of my knowledge, yeah.  It looks that way.

14   Q    And you did fill in some of the information in the

15   Advantage Line credit application?

16   A    Yes.

17   Q    So you're not disputing that your handwriting is on these

18   documents?

19   A    No.

20   Q    Or that you filled them out with false information?

21   A    No.

22   Q    Are you claiming it was not against the bank's code of

23   ethics to engage in this conduct?

24   A    We were coached back then.  When we got applications like

25   this, when they left these things out, these guys were

1    probably referred to me from that broker, and the broker

2    probably told them, you know, "Leave these areas blank, and

3    talk to Rahsaan, and figure out what you guys need to put in

4    here to qualify."  That very well could have been happened.

5    Q    You think that could have happened.  You don't know?

6    A    Yeah.  I would have talk to the clients, and this is where

7    the coaching part came in.  I told them, "Hey, you're

8    probably going to need to be at this income level to qualify

9    for this loan.  What do you want me to put here?"  And this

10   was -- you know, I hate to say it, but it was a very common

11   practice back then.

12   Q    You knew it was wrong, though, correct?

13   A    No, not necessarily, no.  I didn't figure -- I didn't

14   really understand the risk tolerance and the -- you know, the

15   things that we were doing that were putting the bank in

16   harm's way until I really started working on the development

17   of the new broker division, and that's when the light went

18   off for me.

19       I didn't have that -- that experience or that knowledge to

20   really understand the risks, and I was pushed so hard to

21   create numbers.  And I wasn't the only banker who did that.

22   It was very, very common practice.

23   Q    Did you get along okay with Ryan Gipple?

24   A    Yeah, yeah.

25   Q    Did you think he agreed with your termination in 2000?

1    A    I don't know.  I know he was really upset about it.  I

2    don't know if he agreed with it or not.

3    Q    He's the one that actually terminated you, correct?

4    A    I believe so, yeah.  He was my hiring manager.

5    Q    After you reviewed these documents during the two-hour

6    investigation, correct?

7    A    Yeah, it sounds that way.

8    Q    So at least in his opinion, this wasn't okay at the bank;

9    is that correct?

10   A    Sure.

11   Q    And he was your manager who you worked with a lot, and he

12   promoted you, correct.

13   A    I wouldn't say I worked with him a lot.  I didn't work

14   under him until I moved into this position.  He was another

15   layer of my former boss.

16   Q    And when you moved over to the mortgage broker program,

17   you were working with the brokers more, correct?

18   A    Strictly brokers.

19   Q    But back when you were processing this loan application in

20   June of '99, you were still working directly with customers,

21   correct?

22   A    Correct.

23   Q    And you had testified that when you got investigated in

24   '99, the events that led to that was some broker coming to

25   you with some application, and you saying, "I have to have"?

1   Q    Was his termination related to some large-scale fraud

2   investigation involving other bankers?

3   A    No.

4   Q    Did you misrecollect that, it to be part of that, in 2010,

5   when you discussed his rehire?

6   A    Rephrase the question, please.

7   Q    Did you initially think that Mr. Freeman's termination in

8   2000 -- let me back up and start over.

9        In 2010, when you learned he had been rehired and you

10  were discussing that with others in the bank, did you

11  initially think that his termination was part of some

12  large-scale fraud investigation involving other bankers?

13  A    No.

14  Q    So the reasons, in your mind, for his termination in 2000

15  were falsifying an Advantage Loan application for the

16  Erdahls, falsifying income verification forms for the

17  Erdahls, and doing the mortgage with his brother-in-law; is

18  that right?

19  A    And the other issues that all added up, but the main topic

20  of the conversation back in 2000 was the Erdahl loan.

21  Q    And him having helped them fill out the Advantage Line

22  loan application, and him having completed the income

23  verification forms were, in your mind, equally serious, right?

24  A    He committed loan fraud with both the loan application and

25  the income verifications, yes, equally serious. Had mentioned

1   to them at the time of his rehire.

2   Q   Yeah.  You thought that what he disclosed to Ms. Nix and

3   Mr. Leonard when they interviewed him for this job was, "I

4   was fired for doing a second mortgage on my house with my

5   brother-in-law"?

6   A   That's what I recall, after reading my deposition.

7   Q   And you thought that was all he disclosed?

8   A   Yes, but I don't know.

9   Q   And you didn't even recall that issue when you first heard

10  he'd been rehired?

11  A   Right.

12  Q   You didn't recall -- just so it's clear, that you didn't

13  recall that he had done a second mortgage with his

14  brother-in-law, and that had come up during the interview

15  that led to his first termination?

16  A   Correct.

17  Q   But you thought that's what he told Mr. Leonard, that this

18  was the reason for his termination.

19  A   I believe so, yes.

20  Q   There are, I think, six people in human resources in this

21  district, or there were at the time; is that right?

22  A   I don't think I understand the question.

23  Q   In this district, I don't know if the district that we're

24  in or that you worked in in 2010, if it includes more than

25  Western Washington,s I don't know the exact boundaries I had

1    mentioned to them at the time of his rehire.

2    Q    Yeah.  You thought that what he disclosed to Ms. Nix and

3    Mr. Leonard when they interviewed him for this job was, "I

4    was fired for doing a second mortgage on my house with my

5    brother-in-law"?

6    A    That's what I recall, after reading my deposition.

7    Q    And you thought that was all he disclosed?

8    A    Yes, but I don't know.

9    Q    And you didn't even recall that issue when you first heard

10   he'd been rehired?

11   A    Right.

12   Q    You didn't recall -- just so it's clear, that you didn't

13   recall that he had done a second mortgage with his

14   brother-in-law, and that had come up during the interview

15   that led to his first termination?

16   A    Correct.

17   Q    But you thought that's what he told Mr. Leonard, that this

18   was the reason for his termination.

19   A    I believe so, yes.

20   Q    There are, I think, six people in human resources in this

21   district, or there were at the time; is that right?

22   A    I don't think I understand the question.

23   Q    In this district, I don't know if the district that we're

24   in or that you worked in in 2010, if it includes more than

25   Western Washington,s I don't know the exact boundaries I

1    A    Correct.

2    Q    And you didn't have hardly any contemporaneous notes from

3    which to prepare them?  You went from memory?

4    A    Right.

5    Q    And most of the pages we're looking at purport to be a

6    verbatim transcript, don't they, like question, answer,

7    question, answer, right?

8    A    It's not verbatim.

9    Q    No?

10   A    We met for two hours so this is a summary of that two-hour

11   meeting.

12   Q    And it's very incomplete?

13   A    It's not complete, you're correct.

14   Q    And it's fairly one sided you'd admit that?

15   A    No this is factual information.

16   Q    You included only the things that you thought were most

17   egregious.

18   A    This is a summation of that two-hour meeting that

19   Mr. Gipple, Mr. Reichert and I had with Mr. Freeman.

20   Q    And you don't have any independent recollection of what

21   was said in that interview independent of this piece of

22   paper?

23   A    I have the independent recollection of the Erdahl

24   falsification but --

25   Q    Sorry to interrupt but I'm talking about what specifically

1    was said in the interview and is being reflected in these

2    notes.  You don't have any independent recollection of what

3    was said?

4    A    I do have an independent recollection of the Erdahl

5    falsification.

6    Q    I'm talking about what was said in the interview.  You

7    know, there are quite a few, for example, on the second,

8    third page, 356 where you start is this your handwriting and

9    Mr. Freeman's answers go on at length with one word each,

10   right?

11   A    Yes.

12   Q    And you don't know now as you sit here whether he actually

13   only answered with one-word answers during that portion of

14   the interview?

15   A    I don't know but this is a summary.

16   Q    Okay and one more question.  This wasn't actually in his

17   personnel file, right?  It was in your office in a file

18   folder that you discovered when you found out that Joey Nix

19   and David Leonard had hired him?

20   A    This was in my office but my practice would have been to

21   put copies in his personnel file as well.

22   Q    But you know that Jan Coonley and her people in Seattle

23   couldn't find the personnel file?

24   A    That's because the termination was so old that that

25   personnel file would have been destroyed.

1    Q    And in that capacity, you recruited Rahsaan Freeman in
2    2010?
3    A    He applied for the job, and I hired him.
4    Q    You recruited him, right?
5    A    What do you mean by "recruited"?
6    Q    You called him and asked him to apply?
7    A    Yes.
8    Q    And U.S. Bank authorized you to recruit and hire someone
9    for that position?
10   A    Correct.
11   Q    Now, I understand you heard he was available from someone
12   else, another banker, and that he was really good, so you
13   called him and asked him if he would be interested in the job
14   at U.S. Bank, right?
15   A    Correct.
16   Q    And for that position, you considered about 27 different
17   candidates, right?
18   A    That's correct.
19   Q    And you interviewed about ten of them?
20   A    Uh-huh, yes.
21   Q    And I understand the top four candidates would be asked to
22   submit to a talent assessment of some kind by the Gallup
23   organization?
24   A    It wasn't always the top four, but that was what our goal
25   was.   In other words, if we had an abundance of applicants,

1    A    Yes.

2    Q    So was he already in your top four, then, at that point?

3    A    No.  He was one of probably just a couple.  I hadn't

4    Galluped everybody yet.  He was one of the first people we

5    Galluped.

6    Q    Okay.

7    A    But he scored an A.

8    Q    Sure.

9         And this -- you had him do the Gallup right away, like,

10   before you even investigated his past termination, right?

11   A    I believe so.

12   Q    And in your very first conversation with him, when you

13   called him initially, he told you that he worked at U.S. Bank

14   before and had been terminated, right?

15   A    Yes.

16   Q    And he specifically told you that he didn't exactly know

17   why or know all the reasons he had been terminated, right?

18   A    Yes.

19   Q    And he told you what he understood were the reasons?

20   A    Yes.

21   Q    That he'd done a second mortgage with his

22   brother-in-law --

23   A    Uh-huh.

24   Q    -- for himself, and that he had coached some customers on

25   what to say to qualify for a loan?

1   place?  Did that happen?

2   A    I was told they were searching for his file.

3   Q    So you and Joey did speak to somebody in human resources,

4   right?

5   A    Yes.

6   Q    And was that -- that was the same day you both interviewed

7   him?

8   A    Yes.

9   Q    And who did you speak to first in human resources?

10  A    Jan Coonley.

11  Q    And she is, I think, in Los Angeles, right?

12  A    Gosh, I don't know where she was at.

13  Q    Oh, you don't?

14  A    No.  I didn't know what city she was in.

15  Q    Why did you call her?

16  A    Because she was in charge of our group, the small business

17  group, for HR.

18  Q    Did you call anyone local in human resources?

19  A    When?

20  Q    I guess ever in this process.

21  A    No.  She was our assigned person.  She was in charge of

22  our group.  I had no reason to call anybody else.

23  Q    Did you know any of the people in human resources in

24  Seattle?

25  A    No.

1   A    That's correct.

2   Q    Did you ask Sharon Bach or anyone else if that was true?

3   A    I believe we asked Ian, and Ian didn't remember it.  And

4   Sharon didn't -- she said it was used, but she didn't know

5   when it started and when it ended.

6   Q    Mr. Leonard, you thought Rahsaan Freeman's termination --

7   that he got a raw deal, don't you?

8   A    Yeah.

9   Q    Did you tell him that?

10  A    That he got a raw deal?

11  Q    Yeah.

12  A    No.

13  Q    You didn't think he was treated fairly, did you?

14  A    Yes.

15  Q    Did you tell him you didn't think he was being treated

16  fairly?

17  A    No.

18  Q    He was pretty upset, though, when he heard you were

19  terminating him, right?

20  A    We all were upset.

21  Q    Did he mention to you taking legal action?

22  A    Yes.

23  Q    But he called you and talked with you about banking and

24  about other jobs, several times, after you terminated him,

25  right?

```
 1   A   Yes.

 2   Q   So did you feel he still trusted you and valued your

 3   feedback?

 4   A   Yes.

 5   Q   So evidently he wasn't upset with you personally?

 6   A   It didn't seem like it, no.

 7   Q   Can you think of why that might be?

 8   A   We built a rapport during the initial interview and second

 9   interview, and, plus, we were trying to keep him, until we

10   had evidence that changed our mind.

11             MR. JOHNSON:   Thank you.

12             THE COURT:   Cross-examination for Mr. Leonard?

13                     CROSS-EXAMINATION

14   BY MS. LUCHT:

15   Q   Mr. Leonard, when you reviewed the information that

16   Ms. Bach sent to you, what did you conclude as to what

17   Mr. Freeman told you during the interview process?

18   A   That what he was terminated for was not the things that he

19   had told us.

20   Q   And did you believe he had been honest during the

21   interview process?

22   A   No.

23   Q   And did you believe that, based on what he had told you

24   and what facts were uncovered, it was appropriate to keep him

25   employed at U.S. Bank?
```

```
 1   A    No.

 2   Q    And with respect to Sharon Bach, you didn't know Sharon

 3   Bach, because she wasn't involved with your group, correct?

 4   A    That's correct.

 5   Q    So Mr. Freeman never indicated that Ms. Bach would have

 6   any information about his employment, correct?

 7   A    No.

 8   Q    Would you have any reason to think that she did have

 9   information about his former employment?

10   A    No.

11   Q    And did you have any obligation to follow Ms. Bach's

12   recommendation regarding termination?

13   A    No.

14   Q    And who would make the final termination decision?

15   A    Joey and myself.

16   Q    Did you ever tell Mr. Freeman that the past is in the past

17   and nothing that had happened in 2000 would affect his

18   current employment?

19   A    No.

20   Q    And with respect to after Mr. Freeman was offered the job,

21   did he tell you he was going to go start working off the

22   clock and bring deals over?

23   A    No.

24   Q.   And then when he actually started his employment with U.S.

25   Bank, did he ever bring you any deals?
```

1    Q    (By Ms. Lucht)  Were you only involved in one interview

2    with Mr. Freeman?

3    A    I believe so.

4    Q    And can you tell me in a little more detail how he

5    explained the two issues that he said he was terminated for?

6    A    Yes.  The one issue that he explained was he had -- he

7    wanted to get a home equity loan, and that our process would

8    be to do it through one of our branches, that he did not feel

9    comfortable with any of his peers or branch managers knowing

10   his income or his personal information, and that his

11   brother-in-law worked for the bank, and that he asked and

12   received permission from his supervisor to have his

13   brother-in-law process the loan, because our company policy

14   is we do not do business with family members.

15   Q    And so you understood that he had the authority of his

16   manager at the time?

17   A    Yes, yes.  And the other issue that he shared with us was

18   that he had coached a customer, and that at the time -- the

19   way he explained it to me was that it was more like a sales

20   technique in order to get a higher loan amount, and explained

21   to the customer what level of income it would require or what

22   the business revenue would need to be in order to qualify for

23   a certain loan amount, and then would ask, you know, "Is it

24   possible that" -- "best case scenario, is it possible that

25   your company could generate sales of this amount?"  And if.

1   Q    And why did you think he had falsified it?

2   A    Because the hourly rate did not -- the wage was not

3   correct.  And also I subsequently learned that Ken Clarkston,

4   the name of the individual who verified the employment for

5   the Washington State Patrol, was a fictitious name.

6   Q    And after seeing this information that Ms. Bach provided

7   that Mr. Freeman worked on, what did you conclude?

8   A    I concluded that what he had told me in the interview and

9   told me repeatedly when I asked him if there was anything

10  else or what the reason -- you know, that he could recall

11  anything that would, you know, the circumstances, that he

12  hadn't been truthful with me.

13  Q    And at that point did you think it appropriate to continue

14  to employ him?

15  A    No, I thought it was inappropriate.  I thought it was

16  appropriate to terminate him.

17  Q    At any point did you think he got a raw deal?

18  A    No.

19  Q    And did you ever tell him that you thought he got a raw

20  deal or that you thought the bank was doing something unfair?

21  A    No.

22  Q    At any point did you tell him the termination decision was

23  unfair?

24  A    No.

25  Q    And who made the termination decision?

1   A    I did.

2   Q    And did you also learn anything about the brother-in-law

3   processing the loan, from the termination documentation from

4   2000?

5   A    In the termination documentation from 2000, it just

6   mentioned that he had a family member process the loan.

7   There was no mention of what he had specifically stated to

8   me, that he had received approval.

9   Q    Okay.  So there's no mention of a manager letting him do

10  it?

11  A    No.

12  Q    Which is what he told you during the interview process,

13  correct?

14  A    Yes.  And during the interview process, when I asked him

15  why he would be terminated for something that a manager had

16  approved, why wouldn't the manager be able to corroborate his

17  story, he said the manager no longer worked for U.S. Bank.

18  Q    But as far as you know, that was never raised in the

19  termination, correct?

20  A    No.

21  Q    And when you had the documents, and then called -- you,

22  again, called Mr. Freeman, correct?

23  A    Yes.

24  Q    And how did he explain this?

25  A    He said that he was -- we -- he was most fixated on the

1   verification of employment income form, stating that that

2   couldn't possibly be the case, because that document did not

3   exist until well after 1999, and he felt that this was all

4   part of a big forgery to terminate him, that it was

5   doctored-up information to terminate him and to discredit

6   him.

7   Q   And did he think Sharon Bach was making up things?

8   A   He didn't state that, to my recollection, but it seemed to

9   be implied.

10  Q   Okay.  So he was suggesting that someone had somehow

11  doctored these --

12              MR. JOHNSON:  Objection.

13              THE COURT:  Let me have you rephrase.

14  Q   (By Ms. Lucht)  What did he tell you about whether or not

15  the documents were authentic?

16  A   He said that he was -- he was very familiar with the

17  documents.  But he said -- he specifically stated that

18  document was not in existence in 1999, and couldn't -- and he

19  did not -- and said that that was not part of the

20  termination.

21      He also stated that Sharon Bach was not part of the

22  termination, that she was not in the room, that he didn't

23  know who she was.

24              MR. JOHNSON:  Excuse me.  I move to strike the

25  statement about what Mr. Freeman was familiar with during the

1    phone conversation.  Lack of foundation.

2            MS. LUCHT:  I believe the plaintiff testified as to

3    what Mr. Freeman told her he was familiar with.

4            THE COURT:  Correct.  The objection will be

5    overruled.

6    Q    (By Ms. Lucht) So he indicated that Ms. Bach wasn't a part

7    of the termination at all?

8    A    Yes.

9    Q    Okay.  And did you believe that that was correct?

10   A    Did I believe that...?

11   Q    That Ms. Bach was not involved in the termination.

12   A    No.  I believed she was.

13   Q    So did you think he was telling you the truth during that

14   telephone conversation?

15   A    No.

16   Q    And when you initially hired him, did you have concerns

17   about him, based on his past?

18   A    I knew I was taking a risk, but, again, I felt that, given

19   the circumstances and what he had portrayed to me, that that

20   could be plausible.  I also had repeated conversations with

21   David that, you know, I wanted to make sure that we, you

22   know, watched him like a hawk, was my exact words, that every

23   deal Mr. Freeman submitted, that needed to be reviewed by

24   David, and David needed to meet with every customer.

25   Q    And you actually had to hold the job open for him, right?

```
 1    A    Yes.

 2    Q    And you sent him to training in California?

 3    A    Yes.

 4    Q    And did you ever see any indication that he was actually

 5    bringing customers to U.S. Bank before his employment or

 6    during his employment?

 7    A    No.

 8    Q    Okay.   And do you understand what at-will employment is?

 9    A    Yes.

10    Q    And are you authorized to change employees' at-will

11    employment at U.S. Bank?

12    A    No.

13    Q    And did you ever say anything to Mr. Freeman that

14    suggested he couldn't be terminated for some specific reason?

15    A    No.

16    Q    And did you ever promise him, "the past was in the past"?

17    A    No.

18    Q    Did you ever say anything like that?

19    A    No.

20    Q    All right.   And did you ever tell him that his prior

21    termination would not impact his future employment with U.S.

22    Bank?

23    A    No.

24    Q    And you were upset at the termination time, correct?

25    A    Yes.
```

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 29th day of July 2014.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter